

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

**OCT 24 2016**

ARTHUR JOHNSTON
BY_____ DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**LISA J. MCCOMBS**                                                                    **PLAINTIFF**

**VERSUS**                                   CAUSE NO: 1:16cv386 HSO-JCG

**AMERICAN AIRLINES, INC.,
Individually and d/b/a Envoy Air, Inc.
and/or American Eagle Airlines, Inc.
and/or ExpressJet Airlines;
ENVOY AIR, INC., f/k/a American Eagle Airlines, Inc.,
Individually and d/b/a American Airlines, Inc. and/or
American Eagle Airlines, Inc.; and/or ExpressJet Airlines; and
JOHN AND JANE DOE A, B, C, D, E, F, AND G**          **DEFENDANTS**

**COMPLAINT
(JURY TRIAL REQUESTED)**

COMES NOW THE PLAINTIFF, Lisa J. McCombs, by and through undersigned counsel, and files this her Complaint against the Defendants, AMERICAN AIRLINES, INC., Individually and d/b/a Envoy Air, Inc. and/or American Eagle Airlines, Inc. and/or ExpressJet Airlines; ENVOY AIR, INC., f/k/a American Eagle Airlines, Inc., Individually and d/b/a American Airlines, and/or American Eagle Airlines, Inc. and/or ExpressJet Airlines; and JOHN AND JANE DOE A, B, C, D, E, F, AND G, as follows:

**PARTIES**

1. Plaintiff, LISA J. MCCOMBS ("Ms. McCombs"), is an adult resident citizen of Harrison County, Mississippi.

2. Defendant, AMERICAN AIRLINES, INC. ("AA" or "American Airlines"), is a Delaware corporation with its principal place of business in Texas; that is licensed to do and does business in the State of Mississippi individually and/or as Envoy Air, Inc. and/or as American Eagle Airlines, Inc. and/or as ExpressJet Airlines, and which committed acts that subject it to jurisdiction in Mississippi; and which may be served with process by service upon its registered agent, C.T. Corporation System, 645 Lakeland East Drive, Ste 101, Flowood, Mississippi 39232.

On information and belief, AA directly participated in and/or controlled the torts against Ms. McCombs.

3. Defendant, ENVOY AIR, INC. ("Envoy") was formerly known as American Eagle Airlines, Inc., and is a Delaware corporation with its principal place of business in Texas; that is licensed to do and does business in the State of Mississippi individually and/or as American Airlines and/or as American Eagle Airlines, Inc. and/or as ExpressJet Airlines, and which committed acts that subject it to jurisdiction in Mississippi; and which may be served with process by service upon its registered agent, C.T. Corporation System, 645 Lakeland East Drive, Ste 101, Flowood, Mississippi 39232.

4. Defendants, JOHN AND JANE DOE A, B, C, D, E, F, AND G, are individuals and/or entities who caused or contributed to the harms, injuries and damages to Ms. McCombs, but whose identities, and the scope of their liability, are presently unknown to Ms. McCombs. Ms. McCombs will amend her Complaint to identify any and all John and Jane Doe Defendants and describe their liability, when their true identities and liability are ascertained.

5. Unless otherwise specified, each reference in the Complaint to "Defendants" will be a collective reference to all named Defendants.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under the provision of Title 28, United States Code § 1332, in that this suit is a civil action between citizens of different States wherein the matter and actual controversy exceeds the sum value of $75,000.00, exclusive of interest and costs; and/or pursuant to Title 28, United States Code § 1332, in that some of the alternate claims pled herein arise under the Americans' with Disabilities Act.

7. Venue of this civil action is appropriate in this Court pursuant to Title 28, United States Code, § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim

occurred in the Southern District of Mississippi; and/or pursuant to §1391(c)(2) because the Defendants, and each of them, are statutorily considered to be *residents* of the State of Mississippi; are subject to personal jurisdiction in Mississippi; and have sufficient contacts with Mississippi including conducting continuous business in this State. Defendants, and each of them, either individually and/or d/b/a the other, made a contract with Ms. McCombs to be performed in whole or in part in the State of Mississippi (flights from Gulfport, Mississippi to Manhattan, Kansas and back to Gulfport, Mississippi), and routinely operate flights into and out of the Gulfport / Biloxi Regional Airport.  Defendants' contacts with the State of Mississippi were deliberate and purposeful, and Ms. McCombs' claims arise from those contacts, such that exercise of personal, specific and/or general, jurisdiction over the Defendants and each of them in the State of Mississippi is consistent with traditional notions of fair play and substantial justice.

8. Upon information and belief, at all times relevant to this matter, Defendant AA had (1) the right to control the work of Defendant Envoy / American Eagle regarding Envoy's treatment of Ms. McCombs, fulfilment of duties owed to Ms. McCombs, protection of Ms. McCombs' rights and fulfillment of Ms. McCombs' contract to fly from Gulfport, Mississippi to Manhattan, Kansas and back to Gulfport, Mississippi; (2) the right to prescribe and furnish the details of the kind and character of the work to be done regarding Envoy's treatment of Ms. McCombs, fulfilment of duties owed to Ms. McCombs, protection of Ms. McCombs' rights and fulfillment of Ms. McCombs' contract to fly from Gulfport, Mississippi to Manhattan, Kansas and back to Gulfport, Mississippi;  (3) the right to supervise and inspect the work regarding Envoy's treatment of Ms. McCombs, fulfilment of duties owed to Ms. McCombs, protection of Ms. McCombs' rights and fulfillment of Ms. McCombs' contract to fly from Gulfport, Mississippi to Manhattan, Kansas and back to Gulfport, Mississippi; (4) the right to direct the details of the

3

manner in which the work was to be done regarding Envoy's treatment of Ms. McCombs, fulfilment of duties owed to Ms. McCombs, protection of Ms. McCombs' rights and fulfillment of Ms. McCombs' contract to fly from Gulfport, Mississippi to Manhattan, Kansas and back to Gulfport, Mississippi; and (6) other non-enumerated rights controlling the business of Defendant Envoy.

9.   Upon information and believe, at all relevant times Defendant AA was a co-principal of Defendant Envoy; and/or Envoy was in an agency relationship with AA regarding the operations of the business of Envoy and regarding the handling and treatment of Envoy's passengers, including Ms. McCombs;  and AA and Envoy each directly participated in the torts against Ms. McCombs, such that Defendants, and each of them, are individually and jointly and severally liable for any and all harms, damages and injuries of Ms. McCombs described herein.  Further, upon information and belief, the finances of these entities are so interwoven and/or intermingled that one cannot determine the individual net worth of any named entity, required under the Mississippi punitive damages statute, without considering the net worth of each of the others.

## FACTS AND CAUSES OF ACTION

10. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

11. Ms. McCombs joined the United States Army, and entered Officer Candidate School as Specialist (E4), in 2005.  Just prior to graduation, Ms. McCombs was promoted to Sergeant (E5), and was pinned Lieutenant (01) following graduation in approximately 2006.  She continued to be promoted, and was a Captain (03) when she was Honorably Discharged from the Army in 2009.  Ms. McCombs' tour of duty included stations in active conflict zones in Iraq and in Afghanistan.  For her service, McCombs was awarded the Afghanistan Campaign Medal with Campaign Star; the NATO Afghanistan Service Medal; the Army Commendation Medal (2nd

Award); the National Defense Service Medal; the Global War on Terrorism Service Medal; the Iraq Campaign Medal with Campaign Star; the Army Service Ribbon; and the Overseas Service Ribbon (2nd Award).

12. As a direct and proximate result of those experiences, Ms. McCombs developed, and was ultimately disabled by, Post-Traumatic Stress Disorder ("PTSD"), which she was diagnosed with following her separation.  To assist her with her disability, Ms. McCombs has a Service Animal, a Labrador Retriever named "Jake".  Jake is individually trained to perform a specific task to assist Ms. McCombs with her disability.  When Jake senses that Ms. McCombs is about to experience high anxiety and/or a panic attack, Jake moves his body into close contact with Ms. McCombs to distract her attention away from the factors that may cause her panic to spike, and calm her.

13. At all material times, Jake was as a "Service Animal" under the Americans with Disabilities Act ("ADA"); not an "Emotional Support Animal" or "Psychiatric Support Animal."

14. Prior to and at the time of the events that give rise to Ms. McCombs' claims, American Airlines' website stated that "Service Animals are welcome on all flights.  There are no additional charges for service animals traveling in the cabin."  The website further stated that the only requirement for demonstrating an animal is a Service Animal is for the passenger to provide ONE of the following:

    a.   Animal ID card;

    b.   Harness or tags;

    c.   Written documentation to verify the service, psychiatric or emotional support status of your animal; or

    d.   Credible verbal assurance.

https://www.aa.com/il8n/travelInformation/specialAssistance/serviceAnimals.jsp   At all material

times, Ms. McCombs provided Defendants with information that satisfied the requirements to be able to travel with her Service Animal that were set forth on American Airlines' own website.

15. Ms. McCombs purchased airline tickets to fly with American Airlines on October 25, 2015, which included passage on the following flights: Flight American Airlines 2765, departing Gulfport Mississippi for Dallas / Fort Worth on Sunday, October 25, 2015 at 6:00 a.m. (operated by ExpressJet for American Eagle); Flight American Airlines 3087 departing Dallas / Fort Worth for Manhattan, Kansas on October 25, 2015 at 9:00 a.m. (operated by Envoy as American Eagle); Flight American Airlines 3559, departing Manhattan, Kansas for Dallas / Fort Worth on October 25, 2015 at 5:50 p.m. (operated by Envoy as American Eagle); and Flight American Airlines 2742, departing Dallas / Fort Worth for Gulfport / Biloxi at 8:20 p.m. on Oct 25, 2015 (operated by ExpressJet for American Eagle). These airline tickets constituted contracts by and between Ms. McCombs and the Defendants, and were paid for by a credit card with a billing address in, and paid for from, the State of Mississippi.

16. On Sunday, October 25, 2015, at approximately 5:00 p.m., Ms. McCombs arrived at the Manhattan, Kansas regional airport, accompanied by Jake. Jake was appropriately harnessed and vested as a Service Animal.

17. When Ms. McCombs entered the Manhattan Airport accompanied by Jake on the afternoon of Sunday, October 25, 2015, she used the kiosk to check in for her 5:50pm flight, and discovered she was already checked in for the flight.

18. The security checkpoint was closed, so Ms. McCombs sat down in a public waiting area with Jake nearby. While Ms. McCombs and Jake were waiting in this public area, seated among other members of the public, an American Airlines Agent named Dessia Ray Lovve approached them and queried, in a condescending tone, "ummm, are you trying to fly with *that?*" Ms. Lovve nodded / gestured toward Jake as she emphasized "that". Ms. McCombs smiled and explained

6

that Jake was her Service Animal and that, yes, he would be accompanying her on her flight. Ms. Lovve asked Ms. McCombs if she had her "documentation". Ms. McCombs, confused because she had never had an issue flying with her Service Animal in the past, asked the American Airlines Agent what she needed to do and what documentation the Agent required. Rather than answer these questions, Defendants' agent requested Ms. McCombs' photo ID (which was provided) and disappeared. Ms. McCombs and Jake continued waiting in the public waiting area.

19. Ms. Lovve returned a short time later and told Ms. McCombs she could not fly with Jake. Ms. McCombs stated that was not acceptable, and Ms. Lovve disappeared behind the check in desk.

20. Several minutes later, Ms. Lovve asked Ms. McCombs to speak with her Supervisor, identified as American Airlines Lead Agent Curtis Henderson, Jr. Without any introduction, Mr. Henderson brusquely and rudely informed Ms. McCombs (in front of others) "you're not flying with *that* (gesturing toward Jake), we are canceling your flight."

21. Ms. McCombs began to panic, and inquired what Mr. Henderson meant. Defendants' Agent replied that he did not have any "documentation in the system", and advised that he has "SAC" on the phone (but gave no explanation of what this acronym stands for). In compliance with Mr. Henderson's instructions, Ms. McCombs got on the phone with an unknown "SAC". The man on the phone did not identify himself to Ms. McCombs (although Curtis Henderson later advised Ms. McCombs that the name of the man she spoke to on the phone was "Juan Torres, CCRO").

22. Mr. Torres was extremely rude and abusive toward Ms. McCombs. Ms. McCombs explained that she had never had any prior problems flying on American Airlines, or on other airlines, with her Service Animal, and offered to provide Mr. Torres with documentation proving

7

Jake's Service Dog certification.  Mr. Torres told Ms. McCombs that he was canceling her flight; and that she could either pay $125 and put Jake under the plane as cargo or re-submit documentation and be rebooked 48 hours later.  When Ms. McCombs questioned why should could not provide whatever documentation AA required on the spot, Mr. Torres started yelling at Ms. McCombs to "Put the agent back on the phone!  Put the agent back on the phone!"  Mr. Torres refused to listen to anything Ms. McCombs had to say.  At this point, Ms. McCombs anxiety was really kicking in and aggravating her PTSD.  Agent Henderson got back on the phone with Mr. Torres and on his computer.  Ms. McCombs tried to show him documentation on her phone but Mr. Henderson ignored her.

23. Agent Henderson instructed Ms. McCombs to go sit down in the public waiting area outside the concourse.  Mr. Henderson said he had a plane to unload and that he would "deal" with Ms. McCombs after he completed that task.

24. Ms. McCombs suffered rising anxiety and panic.  Ms. McCombs called the customer service hotline for American Airlines, and explained what was happening to a woman who identified herself as "Evette". Evette told Ms. McCombs that her Service Dog was identified on her reservation and that as a medical alert service animal no further documentation was required.  Evette asked if Jake had a vest on and Ms. McCombs confirmed that he did.  Evette seemed confused about what the Defendants' Agents in Manhattan were requesting.  Evette remained on the phone with Ms. McCombs through some of her interaction with Defendants' Agents in Manhattan.

25. After Ms. McCombs had been forced to miss her 5:50 p.m. flight, Agents Lovve and Henderson returned around 6:00 p.m. and verbally assaulted Ms. McCombs, which was witnessed by numerous members of the public.  Defendants' Agents verbally, loudly demanded from Ms. McCombs: "What is your disability anyway?"" repeated that AA was "canceling your

flight"; and demanded from Ms. McCombs "What service does he [Jake] provide you?" in rapid fire succession.  Ms. McCombs was stunned by these verbal assaults, and responded in tears "I have PTSD, look at me, I'm an anxious mess! He's my Service Dog! I don't understand why I'm being treated like this!"  Ms. McCombs identified the specific task Jake had been trained to perform to assist her with her disability.

26. Defendants' agents conduct, whereby they treated Ms. McCombs as if she were falsifying her disability and/or her Service Animal humiliated Ms. McCombs in front of numerous members of the public. Ms. McCombs was so visibly shaken that other people in the public waiting area tried to get involved.  Several members of the public who overheard the verbal assaults launched by Defendants' agents scolded the Agents that "You can't ask her that!"  One gentleman pulled up legalities of flying with Service Animals on his mobile phone and tried to speak to the Defendants' Agents, but they disregarded him.  Other members of the public attempted to comfort Ms. McCombs and find out why the Defendants' Agents were treating her so rudely.

27. At some point, the AA customer service representative Ms. McCombs was on the phone with, Evette, came back with what she represented to be an answer from her boss who, Evette alleged, also talked to "SAC".  Evette advised that if Ms. McCombs printed out the documentation she possessed and handed it to the Agents she would be permitted to make her flight. Ms. McCombs advised Agent Henderson about these instructions; and he wanted to talk to the AA representative on the phone, but Evette advised Ms. McCombs that she was not allowed to speak to the Agent.  Agent Henderson called SAC and told them Ms. McCombs had advised him that she was talking with someone from SAC – which was not true, as Ms. McCombs made it clear to Agent Henderson that her instructions were coming from American Airlines Customer Service.

28. Ms. McCombs had her laptop and email open to show Defendants' Agents documentation proving that Jake was her Service Animal. Agent Henderson was adamant that "headquarters" had spoken and that his prior ruling was final – Ms. McCombs could pay $125 to have Jake shipped as "cargo" under the plan; or resubmit her documentation and try to book a flight for 48 hours later. Ms. McCombs explained that these were not acceptable options; that she did not live in Manhattan or even have a toothbrush with her.

29. Ms. McCombs was so distraught over the abusive manner in which she was being treated by Defendants' agents that she cursed out loud. Agent Henderson immediately lashed out at Ms. McCombs not to curse; or he would have her arrested. On information and belief, Agent Henderson did call the police; however they did not get involved in the incident, but merely hung around until after Ms. McCombs left the airport. When she was ultimately kicked out of the premises by Defendants' agents, one of the Officers even asked her if she wanted a ride to a local shelter for the night.

30. Agent Henderson suggested Ms. McCombs was lying about who she was on the phone with; and continued to insist that "headquarters" made the final decision and that the final decision was that Ms. McCombs' flight (which she had paid for in full) had been cancelled; and that Ms. McCombs could only fly with Jake if she resubmitted documentation and waited at least 48 hours.

31. Ms. McCombs requested Agent Henderson provide her with instructions regarding what documentation American Airlines was requesting and how to submit it. Agent Henderson re-booked Ms. McCombs flight for Tuesday morning (48 hours later), provided Ms. McCombs with a fax number he advised was to the American Airlines Special Assistance Coordinator, and advised Ms. McCombs that she would only be allowed to fly after she provided "SAC" with the necessary documentation. Agent Henderson never did answer Ms. McCombs' questions about

10

exactly what additional documentation American Airlines was requesting, if any, over and above the documentation Ms. McCombs showed him on her laptop. Agent Henderson then instructed Ms. McCombs that he did "not care where" she went because that was not his "problem"; and that Mr. Henderson had talked to his General Manager who said Ms. McCombs could not remain in the airport's public lobby. Agent Henderson instructed Ms. McCombs that she was not allowed to stay in the public lobby any longer, but must leave the premises. Defendants did not offer Ms. McCombs ANY accommodations for the intervening 48 hours.

32. Ms. McCombs was emotionally crushed and humiliated by the conduct of Defendants' agents, who discriminated against her because of her disability; and who publically shamed her.

33. As required by Defendants' agents, Ms. McCombs left the premises. Following a sleepless night, Ms. McCombs again called American Airlines customer service on Monday morning, October 26, 2015. Ms. McCombs explained the situation to the representative who took her call (name unknown), and requested a sooner flight than Tuesday on which she could return home with her Service Animal. The AA customer service representative booked Ms. McCombs for a flight later that same day (Monday, October 26), advised she was making a notation on the account that Ms. McCombs would be traveling with her Service Animal, and assigned Ms. McCombs a seat in the bulkhead for her and Jake's convenience. Ms. McCombs was able to print out documentation confirming that Jake was her Service Animal, and Defendants' Customer Service Agent assured Ms. McCombs there would be no impediments to flying home with Jake that day.

34. Again, Ms. McCombs went to the Kiosk in the public lobby to check in. The message on the Kiosk alerted Ms. McCombs to see an agent. Ms. McCombs approached the desk and was immediately treated rudely by yet another American Airlines Agent. However, another woman who identified herself as the Manager quickly intervened. The Manager advised she knew who

11

Ms. McCombs was, and that she had been "monitoring the situation since yesterday." Defendants' Manager's tone and body language expressed hostility toward Ms. McCombs.

35. Defendants' Manager brusquely advised Ms. McCombs that it had not been 48 hours, and was visibly annoyed by Ms. McCombs' presence. Ms. McCombs explained that she had spoken with an American Airlines Customer Service Representative, who rebooked her to fly home on a Monday flight with Jake. Defendant's Manager asked Ms. McCombs for her "paperwork", which Ms. McCombs provided. Defendants' Manager denied that the reservation reflected Ms. McCombs would be flying with her Service Animal, but offered that she would "help" by faxing Ms. McCombs' paperwork to SAC. The Manager then disappeared with Ms. McCombs' paperwork.

36. As boarding time for the flight on which she was booked began to get nearer, it appeared to Ms. McCombs that Defendants' Manager may be seeking to purposefully delay her so that Ms. McCombs would miss her flight. At some point Ms. McCombs was advised to go sit in the public lobby and wait. Eventually, Defendants' Manager approached Ms. McCombs. The Manager's body language expressed malice, and even caused Jake to whine and shift uncomfortably. Ms. McCombs advised Defendants' Manager "you need to step back from me. Clearly you are upsetting my dog, you're upsetting me, and you're harassing me. It is against the law to harass a Service Animal and their handler and I will call the police on you." Defendants' Manager chuckled, said "ok", and walked away.

37. Later, Defendants' Manager returned Ms. McCombs' paperwork to her and claimed that Ms. McCombs' disability and need for a Service Animal could not be substantiated because a letter from Ms. McCombs' doctor was missing a date, and the certificate confirming Jake's graduation as a Service Animal had to be dated within the previous year. Ms. McCombs explained that you can't change the date of the Service Animal certification, which is essentially

a graduation certificate; and that no doctor's letter is even required for a Service Animal (as opposed to an ESA, which Jake had previously been before he was fully trained as a Medical Alert Service Animal).   Ms. McCombs was forced to miss the morning flight.   Again, Ms. McCombs was reduced to tears.   Defendants' Manager told Ms. McCombs that her only options were to buy a kennel and pay $125 to have Jake shipped as cargo; get a doctor's license date on her doctor's letter, or seek a refund for the tickets home she had purchased from American Airlines.   Ms. McCombs was again required to leave the public premises.

38. Once outside, Ms. McCombs again called American Airlines Customer Service, and explained the whole situation.   Ms. McCombs was transferred to "Gina" with American Airlines "Special Assistance."   Gina claimed that Jake was listed as an ESA, not a Service Animal, and that as such Ms. McCombs had to provide a dated letter from her doctor.   Ms. McCombs explained that Jake is a fully trained medical alert service animal; and also that she possessed documentation to that effect from "Laurie" with Service Dog Express, and Jake's graduation certificate. Defendants' Special Assistance Representative advised Ms. McCombs that it did not matter what documentation Ms. McCombs had, or provided; and that Ms. McCombs' only options were to pay $125 and have Jake shipped as cargo, get a refund for her ticket home, or provide appropriate ESA documentation with her doctor's license date.

39. Feeling she had no other choice, Ms. McCombs contacted the VA in Biloxi.   However, Ms. McCombs was advised that she would have to physically come into to the Biloxi VA before any records or documentation could be updated.

40. Ms. McCombs decided that seeking a refund from American Airlines was her only remaining option, so she searched online for alternate flight arrangements.   Ms. McCombs was able to find a Delta flight out of Kansas City (which is located about 2 hours away from Manhattan).   Ms. McCombs booked this flight for nearly $500, and rented a car from Enterprise

for $100 to get to Kansas City.  Delta assured Ms. McCombs that she would not be required to present any special documentation to travel with her Service Animal.

41. Shortly after she booked the Delta flight and secured a rental car, Ms. McCombs was contacted by American Airlines' corporate offices.  The representative who contacted Ms. McCombs introduced herself as "Janna". Janna asked what happened, and Ms. McCombs briefly recounted the general chain of events.  Janna advised Ms. McCombs that American Airlines' first goal was to get Ms. McCombs home.  Janna identified and booked a flight that departed Manhattan on Tuesday afternoon, October 27, and assured Ms. McCombs that there would be no problem with Ms. McCombs traveling on this flight with Jake. Janna advised Ms. McCombs that she had "contacted all elements of the itinerary, including Management in Dallas, Texas," where Ms. McCombs would have to change planes.  Janna told Ms. McCombs that she would follow up with her on Wednesday and make sure she had arrived home without incident.

42. Janna called Ms. McCombs back on the afternoon of Tuesday, October 27, prior to the time Ms. McCombs returned to the airport, and again assured Ms. McCombs that there would be no problems with Ms. McCombs and Jake traveling home on the flight booked for that afternoon.  Accordingly, Ms. McCombs canceled the Delta flight and returned the rental car. Although she as able to cancel the Delta flight for no fees, she was forced to pay $60 for the rental car.

43. Ms. McCombs returned to the Manhattan Airport on Tuesday, October 27 and approached the American Airlines desk.  Ms. McCombs was met by the same Manager with whom she had interacted the day before.  Defendants' Manager requested Ms. McCombs' photo ID, looked at it, and returned it with her tickets.  No further questions were asked or comments made other than "have a nice flight." Ms. McCombs and Jake went through security, Ms. McCombs turned over her bag to the valet, and she and Jake boarded the plane.

14

44. After the plane landed in Dallas, Ms. McCombs and Jake exited the plane and waited in the bridge area among 15 or 20 other passengers who were waiting for their valet bags.  While they were waiting, an entourage of American Airlines Representatives came onto and down the bridge, pushing a wheelchair, while loudly calling out so all could hear "we have a disabled Veteran, excuse me, a disabled Veteran, we are looking for a Lisa McCombs, a disabled Veteran." Ms. McCombs was embarrassed, humiliated, and mortified.

45. Ms. McCombs stated "I am Lisa McCombs and I do not need a wheelchair." Defendants' representatives looked at Ms. McCombs, at Jake, at the wheelchair, and at their clipboard, and loudly replied "you're Lisa McCombs, our disabled veteran?" Ms. McCombs replied "yes, I am Lisa McCombs and I am your disabled veteran. And I do not need a wheelchair."

46. Adding insult to injury, one of the female passengers who was waiting there did require a wheelchair – which was waiting there for that passenger unattended, with no help from any of Defendants' representatives.  That passenger put her bags in the wheelchair that had been provided, and pushed the chair up the ramp by herself.

47. Ms. McCombs retrieved her bag and made her way to the gate, where an entourage of Defendants' representatives was again waiting to "greet" her.  This group of representatives insisted on escorting Ms. McCombs and Jake to the dog relief area and to their next gate, making a spectacle of Ms. McCombs and causing unnecessary attention and embarrassment even though Ms. McCombs repeatedly assured them that she and Jake could manage without their assistance.

48. Although she had purchased tickets that would have delivered her and Jake home to Gulfport on Sunday, October 25 at 9:59 p.m., Ms. McCombs and Jake did not get home to Gulfport until 10 p.m. on Tuesday night – 48 hours and an unforgettable, emotionally scarring ordeal later.

49. Ms. McCombs did not receive the promised Wednesday follow up from Jenna.  However, Ms. McCombs did receive a call on Wednesday, October 28 from a man who introduced himself as Jim Palmersheim, the Senior Manager of Military and Veteran Initiatives for American Airlines.  Mr. Palmersheim started asking Ms. McCombs about her United States Military service.  Ms. McCombs stopped him, and advised she felt as if she were being interrogated.  Mr. Palmersheim explained that he had read a letter Ms. McCombs wrote to the CEO of American Airlines, and was contacting Ms. McCombs to acknowledge how embarrassed American Airlines was about the entire situation.  Specifically, Mr. Palmersheim advised that he was calling on behalf of the C.E.O. of American Airlines, and expressly admitted on behalf of the Defendants that:

    a.    "We are owning this";

    b.    "I will be your advocate for your retribution";

    c.    "We are committed to Veterans";

    d.    "We can't change what happened";

    e.    "We are sickened and embarrassed";

    f.    "We are committed to make it right";

    g.    "Our airline really sucked when it came to your experience"

    h.    "People need to be held accountable.  And that's what's happening right now."

    i.    "We are going to make it right, whatever that means for you";

    j.    "This isn't just lip service";

    k.    "The Manhattan crew is already undergoing major re-training."

50. Ms. McCombs asked Mr. Palmersheim what he meant by "retribution", and Mr. Palmersheim explained that American Airlines would cover Ms. McCombs' losses and expenses, as well as her emotional distress.

51. When Ms. McCombs advised Mr. Palmersheim about the way she had been treated when she arrived in Dallas, and offered a wheelchair, Mr. Palmersheim stated he could not believe "the level of ignorance" and that "my embarrassment level just went way up."

52. Mr. Palmersheim referenced a recent, somewhat similar incident involving American Airlines and a Veteran named Jason Haag.  Mr. Palmersheim stated that in Mr. Haag's case American Airlines "actually did the right thing"; but admitted, on behalf of American Airlines, that in  Ms. McCombs' case "this time, with you, we didn't [do the right thing]".   Mr. Palmersheim continued "this is different [than Mr. Haag's case], we screwed up big time."

53. Mr. Palmersheim also invited Ms. McCombs to a Salute to Troops that American Airlines was apparently hosting in Las Vegas in November; and said this would be separate and apart from any other resolution of the way Ms. McCombs had been treated.  Mr. Palmersheim suggested that perhaps Ms. McCombs would like to have some international, First Class tickets for herself and a guest.

54. At all material times Defendants American Airlines and Envoy Air / American Eagle held themselves out as doing continuous and systematic business in Gulfport, Mississippi; and were actively doing business in Gulfport, Mississippi.

55. At all material times each of the individual agents, managers, customer service representatives and other representatives of American Airlines identified or referenced in the preceding paragraphs were employees and/or agents of American Airlines and/or Envoy Air / American Eagle, and were acting within the course and scope of their employment with said Defendants.

56. At all material times, Defendants American Airlines and Envoy / American Eagle partnered and/or joint ventured to provide services and travel to Mississippians in Mississippi, including the Plaintiff, in the name of American Airlines.

## CAUSES OF ACTION

### COUNT 1: Negligence

57. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

58. Defendants, and each of them, and their employees / agents / representatives owed a duty to Ms. McCombs to use reasonable care in confirming that Jake was a "Service Animal".

59. On October 25, 2015; and again on October 26, 2015, Defendants, and each of them, breached their duty by failing to take reasonable steps to confirm, failing to follow their own policies and procedures for confirming, and by failing to confirm that Jake was a Service Animal, and as a result, excluded Ms. McCombs and Jake from the public lobby of the Manhattan Regional Airport and prevented her from traveling home.

60. Said breaches of duty were the actual, direct and proximate cause of harms, injuries and damages to Ms. McCombs in the form of pecuniary loss as well as emotional distress, pain and suffering as set forth below, all of which were foreseeable to Defendants as consequences of Defendants' acts and omissions.

61. As a direct and proximate result of the actions of the Defendants herein, and each of them, as aforesaid, Ms. McCombs was seriously and permanently injured, required medical attention, suffered physical and psychological harms and injuries, lost time from work and her normal pursuits; experienced shock to her nervous system; has incurred expenses and losses, and has suffered and continues to suffer severe emotional harm and injury.

### COUNT 2: Negligence Per Se

62. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

63. Defendants, and each of them, were at all material times under a duty to exercise reasonable care in the treatment and handling of Ms. McCombs when she reported to the Manhattan Regional Airport Lobby on October 25, 2015, and again on October 26, 2015; and again on October 27, 2015; and when she attempted to travel home to Gulfport, Mississippi on each of those dates. Because Ms. McCombs had a disability, Defendants, and each of them, had a duty to provide her assistance as she attempted to move through the Manhattan, Kansas and Dallas / Fort Worth Airports in her attempt to travel home to Gulfport, Mississippi. The standard of care with which Defendants were required to treat and assist Ms. McCombs is codified by 49 U.S.C. § 41705, and 14 CFR § 382.1, et. Seq. (The Air Carrier Access Act).

64. Plaintiff is not asserting a cause of action under the Air Carrier Access Act. Rather, the Air Carrier Access Act sets forth the standard of care for certain of Defendants' duties to Ms. McCombs, the breach of which gives rise to liability to the Plaintiff under State law negligence claims.

65. Defendants, and each of them, breached their duties to Ms. McCombs duties by:

a.   Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, refused to allow Ms. McCombs to stay in the public lobby of the Manhattan Airport, refused to allow Ms. McCombs to travel through the Manhattan Airport, refused to allow Ms. McCombs to board a plane at the Manhattan Airport, and refused to allow Ms. McCombs to travel home through the Manhattan Airport on October 25, 2015 and/or October 26, 2015 because of her disability;

b.   Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, required Ms. McCombs to accept an escort / entourage through the Dallas / Fort Worth Airport, even though Ms. McCombs did not request such an escort and expressly advised Defendants' representatives that she did not require one;

19

c.   Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, excluded Ms. McCombs and denied her the benefit of services available to other persons;

d.   Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, took adverse actions against Ms. McCombs, including but not limited to refused her the right to travel on October 25 and October 26, 2015; offered her a wheelchair they knew she did not need and publically drew attention to her disability, and otherwise made a spectacle of Ms. McCombs on October 27, 2015;

e.   Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, failed to make the premises of the Manhattan Airport that they owned, leased or controlled accessible to Ms. McCombs on October 25 and October 26, 2015;

f.   Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, failed to ensure that Ms. McCombs could readily use all facilities at the Manhattan Airport that they owned, leased or controlled on October 25 and October 26, 2015;

g.   Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, failed to provide Ms. McCombs any seat she requested on October 25 and October 26, 2015;

h.   Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, failed to provide Ms. McCombs with pre-boarding on October 25 and October 26, 2015;

i.   Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, failed to provide Ms. McCombs with the assistance that was

20

requested by Ms. McCombs and/or with the assistance that was offered by customer service representatives of American Airlines and accepted by Ms. McCombs on October 25 and October 26, 2015;

j.    Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, failed to permit Ms. McCombs to travel with her Service Animal on October 25 and October 26, 2015;

k.    Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, failed to accept the proof tendered by Ms. McCombs that Jake was a Service Animal which met the requirements of the Air Carrier's Access Act and the requirements of Defendants' own published policies and procedures;

l.    Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, asked Ms. McCombs what her disability was and required Ms. McCombs to provide medical documentation;

m.    Negligently and/or grossly negligently, either directly and/or through a contractual, licensing or other arrangement, failed to train their personnel regarding the appropriate standards of care with which they were required to treat persons with disabilities and/or persons traveling with Service Animals, such as Ms. McCombs;

n.    Negligently and/or grossly negligently failed to require their contractors, assigns and/or licensees to comply with, and allowed same to breach, each of the above referenced standards;

o.    Other acts and omissions to be shown at the trial of this matter.

66. Ms. McCombs falls within the class of people that the aforementioned codified standards are designed to protect; and her harms, injuries and damages are the type the statutes are designed to prevent.

67. Said breaches of duty were the actual, direct and proximate cause of harms, injuries and damages to Ms. McCombs in the form of pecuniary loss as well as emotional distress, pain and suffering as set forth below, all of which were foreseeable to Defendants as consequences of Defendants' acts and omissions.

68. Defendants', and each of their, violation of the above referenced, codified duties / standards constitutes negligence *per se* and creates a presumption of negligence.

69. As a direct and proximate result of the actions of the Defendants herein, and each of them, Ms. McCombs was seriously and permanently injured, required medical attention, suffered physical and psychological harms and injuries, lost time from work and her normal pursuits; experienced shock to her nervous system; has incurred expenses and losses, and has suffered and continues to suffer severe emotional harm and injury.

### COUNT 3: Negligent Supervision

70. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

71. On information and belief, when engaging in the wrongful conduct described above, each of the individuals identified or referenced in the preceding paragraphs were acting as employees and/or agents American Airlines and Envoy / American Eagle.

72. Defendants, and each of them, knew or reasonably should have known that each of the identified or referenced agents and/or employees was engaging in the wrongful conduct alleged herein, and that this conduct would directly and proximately result in harms, injuries and damages to Ms. McCombs.

73. Defendants, and each of them, knew or reasonably should have known that failing to supervise their agents and/or employees with regard to their treatment of Ms. McCombs and her

22

Service Animal would directly and proximally resulted in monetary, physical, and emotional harms, damages and injuries to Ms. McCombs.

74. Defendants, American Airlines and Envoy / American Eagle, had the authority and duty to supervise, prohibit, control and/or regulate their agents and/or employees to prevent these acts or omissions from occurring.

75. Each defendant knew, or reasonably should have known, that by failing to supervise, prohibit, control, and/or regulate said individual's acts and omissions, that said individual's conduct would be viewed as condoned or ratified by Defendants, and each of them.

76. By failing to supervise, prohibit, control and/or regulate the conduct of their agents and/or employees, defendants American Airlines and Envoy / American Eagle breached a duty owed to Ms. McCombs, which breach directly and proximally caused the injuries and damages set forth herein, all of which were foreseeable to the Defendants as consequences of Defendants' acts and omissions.

77. As a direct and proximate result of the actions of the Defendants herein, and each of them, as aforesaid, Ms. McCombs was seriously and permanently injured, required medical attention, suffered physical and psychological harms and injuries, lost time from work and her normal pursuits; experienced shock to her nervous system; has incurred expenses and losses, and has suffered and continues to suffer severe emotional harm and injury.

**COUNT 4: Negligent and/or Intentional Infliction of Emotional Distress**

78. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

79. American Airlines and Envoy / American Eagle had a duty not to undertake acts that would foreseeably cause Ms. McCombs to suffer emotional distress and mental anxiety.

80. American Airlines and Envoy / American Eagle knew, or should have known, that the acts and/or omissions undertaken by Defendants' Agents on October 25, 26 and 27, 2015, described in the preceding paragraphs, would cause a reasonable person with a disability, such as Ms. McCombs, to suffer physical and/or emotional injury and resulting, severe emotional distress and incidental harms; and knew or should have known that their conduct would have caused Ms. McCombs to suffer such harms, injuries and damages.

81. As admitted by Mr. Palmersheim on behalf of American Airlines, Defendants', and each of their, conduct was "sickening". Defendants', and each of their, treatment of Ms. McCombs on October 25, 2015, October 26, 2015 and October 27, 2015 went beyond all bounds of acceptable conduct in our society, and evidenced willful, wanton and/or reckless disregard for the Plaintiff's rights and emotional well-being. Other members of the public who witnessed the Defendants' employees' and/or agents' public mistreatment of Ms. McCombs agree.

82. As a direct and proximate result of the acts and omissions of the Defendants, and each of them, as set forth in the preceding paragraphs, Ms. McCombs was seriously and permanently injured, required medical attention, suffered physical and psychological harms and injuries, lost time from work and her normal pursuits; experienced shock to her nervous system; has incurred expenses and losses, and has suffered and continues to suffer severe emotional harm and injury.

**COUNT 5: Breach of Contract,**
**and the Independent Torts of Bad Faith,**
**and Breach of the Duty of Good Faith and Fair Dealing**

83. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

84. Ms. McCombs fulfilled all her duties and obligations with regard to the contracts represented by the tickets she purchased to travel from Gulfport, Mississippi to Manhattan, Kansas and back to Gulfport, Mississippi on October 25, 2015.

85.   Having paid for the tickets, completed the first leg of the flight, and showed up at the Manhattan Regional Airport to board the return flight with boarding passes in hand on the afternoon on October 25, 2015, Defendants, and each of them, had a duty to allow Ms. McCombs to travel home with her Service Animal unless the flights were unavoidably canceled.

86.   Defendants, and each of them, had a duty to respect and honor Ms. McCombs' rights under the subject contracts and not recklessly disregard those rights, and at all material times to treat Ms. McCombs with good faith and fair dealing, implied by law.

87.   As described with particularity above, Defendants, and each of them, breached each of those duties.

88.   As described with particularity above, Defendants, and each of them, engaged in conduct that rises to the level of an independent tort, and acted with gross and/or reckless disregard for the rights of Ms. McCombs, to her detriment.

89.   Defendants, and each of them, are liable for the acts and/or omissions described throughout this Complaint, which include but are not limited to:

   a.   Negligent, grossly negligent and/or reckless refusal to allow Ms. McCombs and her Service Animal to travel home on the flight for which she was ticketed and had a boarding pass on October 25, 2015.

   b.   Negligently, grossly negligently and/or recklessly delayed Ms. McCombs' travel for an unreasonable amount of time;

   c.   Acted in conscious, gross and/or reckless disregard for the rights of Ms. McCombs, as described with particularity throughout this Complaint; and

   d.   Acted wrongfully in other respects to be shown upon a trial of this cause.

90.   The actions of Defendants, and each of them, constitute breach of contract, bad faith breach of contract, breach of the duty of good faith and fair dealing, and reckless disregard,

rendering said Defendants liable to Ms. McCombs for actual, compensatory and punitive damages.

91. As a direct, proximate and foreseeable consequence of Defendants', and each of their, breach of contract, bad faith breach of contract, breach of the duty of good faith and fair dealing, and reckless disregard, Ms. McCombs was injured and damaged as described throughout this Complaint, and in the Damages section below, for all of which Ms. McCombs is entitled to be compensated by the Defendants, jointly and severally.

92. In addition to the other damages described throughout this Complaint, it was foreseeable to Defendants, and each of them, that Ms. McCombs would incur attorneys' fees and expenses for having to file suit to enforce her contractual rights. Under applicable law, Plaintiffs are entitled to be compensated by the Defendants for all of these damages, and other incidental damages incurred as a result of having to pursue this litigation.

93. Defendants', and each of their, bad faith conduct described in the preceding paragraphs rises to the level of an independent tort, and/or represents reckless disregard for the rights of Ms. McCombs; such that Ms. McCombs is entitled to recover punitive damages from the Defendants, and each of them, in an amount sufficient to punish the Defendants and serve as an example to deter these Defendants and similarly situated individuals and entities from engaging in such conduct in the future; and to reward Ms. McCombs for bringing Defendants' misconduct to light.

### COUNT 6: Fraud / Fraudulent Inducement / Fraudulent Misrepresentation

94. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

95. Prior to and on October 25, 2015, American Airlines advertised on its website, on behalf of AA and Envoy / American Eagle, that Service Animals are welcome on all flights; and that passengers with Service Animals need only provide one of several enumerated types of

information to fly with Defendants. Defendants, and each of them, expected for members of the public with Service Animals, such as Ms. McCombs, to rely on said representations to purchase tickets from Defendants for air travel with Defendants as opposed to other travel companies with whom they competed. Ms. McCombs did reasonably rely on Defendants' representations, purchased tickets to fly with Defendants from Gulfport, Mississippi to Manhattan, Kansas and back to Gulfport, Mississippi on October 25, 2015, and arrived at the Manhattan Regional Airport for her return trip on the afternoon of October 25 with her boarding pass, her Service Animal, and more than one kind of information required by Defendants' stated policies for traveling with a Service Animal in time for her flight. At the time each of the above referenced representations were made, Defendants knew or should have known that they were false, because Defendants, and each of them, never intended to permit persons such as the Plaintiff to travel with their Service Animals upon presentation of only the information set forth on Defendants' web site. However, at the time the above referenced representations were made, Ms. McCombs was unaware of their falsity, but relied on them to substantially change her position, and provided the consideration requested by Defendants in the manner reasonably contemplated by Defendants, and each of them, in reasonable reliance on Defendants' representations that she would be allowed to travel with her Service Animal as being truthful. At all material times Ms. McCombs was justified in expecting honesty, good faith and fair dealing from the Defendants, and each of them; and had a right to rely on the above referenced representations. As a direct and proximate result of the Defendants' failure to honor and comply with the representations upon which Ms. McCombs relied, Ms. McCombs suffered the foreseeable harms, damages and injuries referenced throughout this Complaint.

96. On the morning of October 26, 2015, an unidentified customer service representative / agent / employee of Defendants, and each of them, told Ms. McCombs over the phone that she

would be allowed to fly with Defendants from Manhattan, Kansas to Gulfport, Mississippi later that day; and that all she needed to do was return to the Airport with proof that Jake is a Service Animal. Defendants, and each of them, expected Ms. McCombs to rely on said representations to return to the Manhattan Airport to fly home to Gulfport, Mississippi on October 26. Ms. McCombs did reasonably rely on Defendants' representations, and arrived at the airport with her Service Animal and proof of his Service Animal status in time for her flight. At the time each of the above referenced representations were made, Defendants knew or should have known that they were false, because Defendants, and each of them, never intended to permit Ms. McCombs to travel home on October 26. However, at the time the above referenced representations were made, Ms. McCombs was unaware of their falsity, but substantially changed her position and went to the Manhattan Airport in the manner reasonably contemplated by Defendants, and each of them, in reasonable reliance on Defendants' representations that she would be allowed to travel with her Service Animal as being truthful. At all material times Ms. McCombs was justified in expecting honesty, good faith and fair dealing from the Defendants, and each of them; and had a right to rely on the above referenced representations. As a direct and proximate result of the Defendants' failure to honor and comply with the representations upon which Ms. McCombs relied, Ms. McCombs suffered the foreseeable harms, damages and injuries referenced throughout this Complaint.

97.   Defendants', and each of their, conduct described in the preceding paragraphs rises to the level of an independent tort, and/or represents reckless disregard for the rights of Ms. McCombs; such that Ms. McCombs is entitled to recover punitive damages from the Defendants, and each of them, in an amount sufficient to punish the Defendants and serve as an example to deter these Defendants and similarly situated individuals and entities from engaging in such conduct in the future; and to reward Ms. McCombs for bringing Defendants' misconduct to light.

98. As a result of Defendants', and each of their, fraudulent conduct, Plaintiffs, and each of them, are entitled to all actual, compensatory, extra contractual, punitive and consequential damages set forth throughout this Complaint, including those set forth in the Damages section, below.

**COUNT 7: Violation of Title II and/or Title III of the Americans with Disabilities Act**

99. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

100. Additionally, and in the alternative, to the extent that the Manhattan Regional Airport is operated by a public entity; Defendants, and each of them, violated Ms. McCombs rights under Title II of the Americans with Disabilities Act by the acts and omissions set forth in the preceding paragraphs. As set forth above, all of the acts and omissions of the Defendants on October 25 and 26, 2015 took place within the public lobby of the Manhattan Regional Airport – which is a public space offering public services to any member of the public, including ticketed and non-ticketed airline passengers. None of the described acts and omissions of the Defendants on those dates took place in the terminal, on the airplane, or even past the security checkpoint. At all material times:

    a.   Ms. McCombs was a qualified individual within the meaning of the ADA;

    b.   Ms. McCombs was excluded by the deliberate acts of the agents, employees and representatives of the Defendants, and each of them, from participation in, and was denied benefits of, services, programs, and activities the public areas of the Manhattan Regional Airport were required to provide to members of the public; and

    c.   The exclusion and discrimination of Ms. McCombs was because of her disability.

101. Additionally, and in the alternative, Defendants, and each of them, violated Ms. McCombs' rights under Title III of the Americans With Disabilities Act on October 25 and October 26, 2015 by the acts and omissions set forth in the preceding paragraphs, because:

a. At all material times, Defendants, and each of them, were private entities that were primarily engaged in the business of transporting people. Specific transportation services Defendants were in the business of providing people included access from the public lobbies of airports to and through the security checkpoints to the terminals. Through the acts and omissions described in the preceding paragraphs, Defendants, and each of them, discriminated against Ms. McCombs on the basis of her disability by refusing to provide, and by actively blocking, her transportation / access through the public lobby area of the Manhattan Regional Airport to the security checkpoints.

b. Additionally, and in the alternative, Defendants, and each of them, owned, leased and/or operated the public lobby area of the Manhattan Regional Airport, which was at all material times a place of public accommodation other than an airport terminal; and discriminated against Ms. McCombs on the basis of her disability by excluding her from the full and equal enjoyment of the goods, services, facilities, privileges, advantages and/or accommodations of said place of public accommodation.

102. Defendants, and each of their acts and omissions in violation of Title II and/or Title III of the ADA were motivated by either discriminatory animus or ill will stemming from Ms. McCombs' disability; and/or reckless disregard for Ms. McCombs' rights. As a direct, proximate and foreseeable consequence of Defendant's stated acts and omissions, Ms. McCombs suffered all of the harms, injuries and damages set forth throughout this Complaint, and demands compensation from the Defendants, and each of them, for her physical and psychological harms and injuries, lost time from work and her normal pursuits; medical care, shock to her nervous

system; incidental expenses and losses, severe emotional harm and injury; as well as reasonable attorneys' fees for bringing these claims, all expenses of litigation, and punitive damages sufficient to punish the Defendants and make an example to prevent similar misconduct in the future.

103.    Plaintiff also requests injunctive relief in the form of an Order requiring Defendants to train their employees and agents to follow applicable law and their own procedures regarding persons with disabilities and traveling with Service Animals, and to treat disabled persons traveling with Service Animals in a manner that is fair and non-discriminatory.

### COUNT 8: *Respondeat Superior*

104.    By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

105.    At all material times each of the individual agents, managers, customer service representatives and other representatives of identified or referenced in the preceding paragraphs were employees and/or agents of American Airlines and/or Envoy / American Eagle, who were acting within the course and scope of their employment with said Defendants and on behalf of both Defendants; and American Airlines and Envoy, and each of them, is liable for their employees' / agents' / representatives' acts and omissions pursuant to the doctrine of *respondeat superior*.

### COUNT 9:  Joint Venture / Partnership / Co-Principals

106. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

107. As described in the factual assertions above, American Airlines and Envoy / American Eagle were acting as a Partnership, Joint Venture, and/or as Co-Principals with regard to the

business of transporting passengers by and between Gulfport, Mississippi and Manhattan, Kansas.

108. On information and belief, Defendants each: expressed their intent to be partners; had the right to participate and did participate in the business of the partnership; had an agreement to contribute and did contribute money or property to the business of the partnership; had the right to share and have shared in the profits of the business of the partnership; and agreed to share in any losses or liabilities of the business of the partnership.

109. Pursuant to common law and statutory law, each of the members of the described Partnership and/or Joint Venture is an agent of the Partnership and/or Joint Venture for the purpose of conducting its business; and the act of any partner binds the Partnership / Joint Venture and each member thereof.

110. Also pursuant to statutory and common law, American Airlines and Envoy / American Eagle and as yet unidentified John and Jane Doe Defendants are each individually, and jointly and severally, liable for any and all injuries and damages of the Plaintiffs described in this Complaint.

111. Additionally, and in the alternative, American Airlines exercised sufficient dominion and/or control over Envoy / American Eagle and/or participated directly with Envoy such that Envoy was American Airlines' agent and/or was a co-principal with said Defendant, such that Defendants, and each of them, are individually and jointly and severally liable for any and all damages and injuries of the Plaintiffs described herein.

## DAMAGES

112. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

113.    Plaintiff prays for full compensation for all the harms and injuries proximately and directly caused by the Defendants', and each of their acts and omissions, and to hold said Defendants jointly and severally liable therefore, as follows:

a.    All past and reasonable future medical expenses for the monitoring and treatment of Plaintiff's PTSD and related physical and/or psychological ailments, injuries or diseases;

b.    All incidental damages, including the costs of over the counter medications, materials needed to accommodate Plaintiff's exacerbated illness, mileage and expenses incurred in traveling to see Plaintiff's treating medical providers, and all other incidental expenses and damages to be shown at trial;

c.    Loss of income and/or wage earning capacity, in an amount to be proved at trial and determined by a Jury;

d.    Reasonable costs of rehabilitative services, if any, in an amount to be proved at trial and determined by a Jury;

e.    Reasonable compensation for loss of enjoyment of life, stigma, and damage to reputation in an amount to be determined by a Jury;

f.    Reasonable compensation for past and future emotional distress and mental anxiety, in an amount to be determined by a Jury;

g.    Refund of the entire purchase price of the subject tickets, plus interest at a reasonable rate not less than 8% per annum since paid since the Defendants' breached their contract with Ms. McCombs on October 25, 2015;

h.    Incidental food, transportation, hygiene, and lodging costs;

i.    Reasonable attorneys' fees, and all costs and incidental costs of litigation incurred in bringing these claims;

j.   Pre-judgment interest on all of Plaintiff's liquidated damages; as well as post judgment interest, in the amount of 8% per anum or such other amount to be set by the Court, running from the date incurred until paid in full; and

k.   Reasonable compensation for all other harms, injuries and damages to be shown at trial, in an amount to be determined by the Jury.

114.   Further, Defendants, and each of their, acts and omissions were attended by gross negligence and/or reckless disregard for the rights of the Plaintiff; such that Plaintiff also demands punitive damages against each Defendant, in amount sufficient to punish each Defendant and set an example to keep these, and similarly situated, individuals and entities from engaging in similar conduct in the future, in an amount to be determined by a Jury at the trial of this matter.  In the event punitive damages are awarded, Plaintiff seeks and prays for an award of reasonable attorneys' fees, and costs and expenses for having to pursue this litigation to enforce her rights; plus pre-judgment interest in an amount not less than 8% per anum; post judgment interest in an amount not less than 8% per anum; and all other damages deemed appropriate by this Honorable Court.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment from and against Defendants, and each of them, jointly and severally, for actual, compensatory and punitive damages, in an amount to be determined by a Jury in this cause, plus reasonable attorneys' fees and costs of litigation, together with pre-judgment and post-judgment interest in the amount of 8% per annum or in another amount provided by law, attorneys' fees and costs of this action, and any and all additional relief deemed appropriate by this Honorable Court.

Respectfully submitted, this the 24th day of October, 2016.

Lisa J. McCombs

BY: _____
CHRISTOPHER C. VAN CLEAVE MSB # 10796

34

Christopher C. Van Cleave, (MSB #10796)
Clyde H. Gunn, III, (MSB #5074)
David N. Harris, Jr. (MSB #100790)
CORBAN, GUNN & VAN CLEAVE, PLLC
Post Office Drawer 1916
Biloxi, Mississippi 39533-1916
Telephone:  (228) 432-7826
Facsimile:   (228) 456-0998
buddy@cgvclaw.com
christopher@cgvclaw.com
david@cgvclaw.com